403 A.2d 1283

**COMMONWEALTH of Pennsylvania**

v.

**Jill V. DeJOHN, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 19, 1978.

Decided May 17, 1979.

Rehearing Denied Aug. 17, 1979.

34

Stanley W. Greenfield, John W. Murtagh, Jr., Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Asst. Dist. Atty., Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

O'BRIEN, Justice.

Appellant, Jill V. DeJohn, was convicted by a jury of murder of the third degree. In a subsequent nonjury trial,

she was also convicted of attempted theft by extortion. Post-verdict motions were denied and appellant was sentenced to concurrent prison terms of ten-to-twenty-years for the murder conviction and one-to-three-years for the attempted theft by extortion conviction. This direct appeal followed.[1]

I

Appellant first claims that the evidence is insufficient to sustain her conviction for murder of the third degree. The facts are as follows.

At approximately 1 a. m., on February 12, 1976, appellant discovered the body of her husband, Michael DeJohn, in the garage of their suburban Pittsburgh home. Death was caused by a single gunshot wound to the back of the head, fired from a distance of no greater than eighteen inches. The victim had been shot by a .25 caliber pistol. A pathologist was unable to set an exact time of death, but estimated that death occurred between 6:15 p. m. and 1:04 a. m. on the evening of February 11 and the early morning hours of February 12, 1976. The pathologist did opine that death appeared to be closer to 6:15 p. m. rather than the later time. The victim had been shot near the door between the garage and the downstairs gameroom and then was dragged about fifteen feet in a series of movements to a spot between the rear of his car and the garage door. A recent bloodstain consistent with the trail of the victim's blood was found on the lip of the trunk of the victim's car, indicating that someone had tried to place the body in the trunk of the car. A sliding glass door to the outside, off the downstairs gameroom, was open approximately eight to eighteen inches with no signs of forcible entry. No footprints were found on the ground outside the open door. According to appellant, the only items missing from the home were $40 or $50 in poker money and a .25 caliber automatic pistol. The

---

1. The judgment of sentence in the attempted theft by extortion case was appealed to the Superior Court, which certified that appeal to this court.

victim's ring, watch and wallet, containing $46, were found untouched on his person.

Mr. DeJohn had left his home at 7:00 a. m. on February 11 for a business trip to Washington, D. C. Appellant had a luncheon date with John Lindemulder, a Pittsburgh area radio personality, at the Sewickley Holiday Inn. Appellant's two children, Dawn, age twelve, and "Cricket," age nine, had been waiting outside the locked home approximately fifteen minutes when appellant arrived home from her lunch date at 4:00 p. m. Appellant told her daughters that Lindemulder was a man from the parking garage who drove her home because her car had broken down. Appellant later admitted that she left her car at Allegheny Center, in the northside of Pittsburgh, where she had met Lindemulder, and returned home without her car because she knew the girls would be locked out of the house.

Appellant testified that the victim called her at their home after 5:00 p. m. from Greater Pittsburgh Airport. She also testified that the victim told her that he had a business meeting, after which he would return home so that the family could go to dinner to celebrate appellant's birthday. According to appellant, her husband told her that should he be late, he would meet her and the girls at the HuKeLau Restaurant. Gilmore Wheeler, the other party to the business meeting, testified that he was unaware of the late night meeting. According to appellant, when her husband had not returned by 7:00 p. m., she called a cab and left for the restaurant with her daughters. The trio returned home at 9:40 p. m. Appellant stated that Mr. DeJohn's absence did not worry her, as he had been late in the past because of business meetings. Before going to bed, appellant went to the garage to turn on the spotlight in the driveway, when she discovered her husband's body.

Appellant's neighbor and the paperboy both testified that they saw the victim's car pull into the DeJohn driveway shortly after 6:00 p. m. on February 11. The time was verified because the neighbor was involved in a toll call on the telephone when he noticed Mr. DeJohn's automobile pull

into the driveway. Telephone company records indicated that the neighbor's telephone was in use between 6:07 p. m. and 6:11 p. m. Further, a parking ticket was found on the victim's body which indicated he had left the airport parking lot at 5:23 p. m. An Allegheny County Detective later made the same drive from the airport to the DeJohn residence, leaving at 5:23 p. m., and arriving at 6:05 p. m.

Appellant was in charge of managing the family finances, as the husband had no interest in monetary matters. As it turned out, appellant was doing a poor job, having missed the last two house mortgage payments, with other indebtedness of $9,000 to $10,000. To obtain money, appellant had signed her husband's name on a loan application at a local bank, to obtain money to pay back $3,000 she owed to an employee of their home builder. The employee testified that he threatened to go to Mr. DeJohn before appellant repaid the loan. Further, appellant admitted attempting to extort $5,000 from a neighbor. Moreover, Mr. DeJohn had submitted a letter of resignation from his job and appellant knew of this.[2] It was stipulated that Mr. DeJohn was insured for $201,000, with appellant being the primary beneficiary.

Appellant and her two children testified that appellant did not go downstairs after 6:00 p. m. The children were watching television in the first floor family room between 4:30 p. m. and 6:30 p. m. Appellant testified that the garage door, when being opened, could be heard throughout the house. Dawn DeJohn testified that she did not hear her father enter the house. The children, however, did not hear the paperboy both knocking on the door and ringing the doorbell,[3] despite the fact that the chimes were located immediately outside the family room.

2. Mr. DeJohn subsequently withdrew his resignation letter. Appellant testified that the day of the homicide, her husband told her of his decision. (Notes of Testimony. Page 940).

3. Officers subsequently fired a .25 caliber weapon in the DeJohn garage while other officers remained in the family room. The officer in the house likened the sound of the gun to a 2″ × 4″ piece of lumber falling onto the concrete floor.

Testimony showed that Mr. DeJohn was an officer in the "Green Berets," an elite Army unit, and had been decorated for bravery in Viet Nam. Patty Marie DeJohn Boyle testified that, in her opinion, because of his background, someone would have had to be familiar with Mr. DeJohn in order to get within pointblank range before shooting him in his own garage. Further, a neighbor testified that appellant had told her she had access to a gun and knew how to use it.[4]

As we recently stated in *Commonwealth v. Long,* 470 Pa. 204, 206, 368 A.2d 265, 266 (1977):

" . . . Since all of the evidence produced by the prosecution to support its theory was circumstantial and the issue before us is the sufficiency of that circumstantial evidence, we note initially what we have said about circumstantial evidence in the past. In *Commonwealth v. Simpson,* 436 Pa. 459, 260 A.2d 751 (1970) we said:

" 'It is true that circumstantial evidence, in itself, may be sufficient to establish the commission of a crime and the accused's connection therewith. . . . It is equally true that in evaluating the sufficiency of the evidence after a guilty verdict, all of the evidence, be it direct or circumstantial, must be read in a light most favorable to the Commonwealth, and the Commonwealth must be given the benefit of all reasonable inferences arising therefrom. . . . But before a conviction will be sustained, "the facts and circumstances proved must be of such a character as to establish guilt beyond a reasonable doubt." . . . And, where a conviction is based entirely on circumstantial evidence, "the theme of guilt must flow from the facts and circumstances proved, and be consistent with them all." . . . If the conviction is based wholly on inferences, suspicion and conjecture, it cannot stand. . . .' " (Citations omitted.)

We believe that the entirely circumstantial case against appellant was sufficient to establish her guilt beyond a reasonable doubt.

---

**4.** Additionally, appellant also bragged that she could plan and commit the "perfect crime."

Testimony of two individuals indicated that the victim's car was seen pulling into his driveway shortly after 6:00 p. m. the day of the killing. After having been away all day and intending to go out to dinner to celebrate a birthday, the jury could find it incredulous that Mr. DeJohn would remain in the garage almost an hour while his wife and two children left for dinner. Further, witnesses testified that because of DeJohn's background in the military, a stranger would not have been able to shoot DeJohn from pointblank range in the back of the head.

While the defense argued that DeJohn possibly confronted a burglar or a robber, the jury may have rejected this theory as implausible for three reasons. First, there was no sign of forced entry anywhere in the house. Second, it is unlikely a burglar or robber would delay his flight after killing DeJohn to drag his body across the garage floor. Third, the victim's watch, ring and wallet, containing $46, were untouched.

Thus, the evidence, read in a light most favorable to the Commonwealth, and the logical inferences therefrom indicate that the victim arrived home shortly after 6:00 p. m. The pathologist testified that DeJohn died between 6:00 p. m. and 1:00 a. m., but in his opinion closer to 6:00 p. m. Appellant had a motive, as she had mismanaged the financial affairs of the family. In an attempt to raise some money, appellant had attempted to extort money from a neighbor and had signed her husband's signature on a bank loan application. Appellant also knew her husband was thinking of quitting his job. As the victim's life was insured in appellant's favor for $201,000, appellant certainly had a motive to kill her husband.

Mr. DeJohn was shot by a .25 caliber weapon. The DeJohns' owned a .25 caliber weapon which was accessible to appellant, although she testified that it was taken in the "robbery." Thus, when read in the light most favorable to the Commonwealth, the evidence and logical inferences show that appellant had the opportunity, means and motive to kill her husband. We thus believe the jury's verdict is supported by the circumstantial evidence beyond a reasonable doubt.

## II

Appellant argues that the court below erred in refusing her motion to suppress certain evidence obtained pursuant to two *subpoenae duces tecum*. The facts are as follows.

Following the homicide, both Ross Township and Allegheny County Police began investigations. Eventually, appellant became a prime suspect. On February 25, 1976, officials of the McKnight Road Office of Mellon Bank were served with a "court subpoena," which demanded "copies of all information pertaining to accounts, or application for account, made by Jill and/or Michael DeJohn of 492 Woodland Road, Pittsburgh, Pennsylvania 15237 (Ross Township)". The document further provided that "copies of records . . . be turned over to County Detectives." On February 27, 1976, a second "subpoena" was issued on the same parties, demanding "all original records pertaining to personal cash reserve account application, and original new account card for Michael and Jil DeJohn. . . ." The subpoena ordered "These records . . . be turned over to Lt. Guthrie, Ross Township Police Department." Each "subpoena" bore the signature of Wayne Kelly, Clerk of Courts, and contained an admonition that "Failure to [comply with the subpoena] may subject you to fine and/or imprisonment." Pursuant to these two documents, police obtained the cancelled check used to purchase the typewriter on which the extortion note had been typed and other evidence which indicated that appellant had signed her husband's signature on a loan application.

At the time both "subpoenae" were issued, there were no ongoing legal proceedings of any nature instituted against appellant. No judge of the Court of Common Pleas or District Justice reviewed or issued the "subpoenae". The District Attorney's "subpoenae" were obtained without any court process. However, one officer testified that this procedure was used "because we've done that in the past and have done it successfully. Secondly, because we were advised to do so by [the Assistant District Attorney in charge of the case]."

Appellant argues that since the subpoenae were unlawful and used to procure evidence, the evidence seized should have been suppressed. As the court below failed to suppress the evidence, appellant argues that she is entitled to a new trial.

The Commonwealth does not argue that the subpoenae were lawful,[5] but rather that appellant lacks the standing to challenge the seizure of the bank records. The Commonwealth relies on *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) and urges this court to apply the *Miller* holding on a case of first impression in this court, i. e. whether a depositor has standing to challenge the seizure of bank records pertaining to that depositor.

In *Miller*, the United States Supreme Court held that the Fourth Amendment to the United States Constitution did not protect a depositor in such a situation. As the Court stated:

> "Respondent urges that he has a Fourth Amendment interest in the records kept by the banks because they are merely copies of personal records that were made available to the banks for a limited purpose and in which he has a reasonable expectation of privacy. He relies on this Court's statement in *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 583 (1967), quoting *Warden v. Hayden*, 387 U.S. 294, 304, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782, 790 (1967), that 'we have . . . departed from the narrow view' that ' "property interests control the right of the Government to search and seize," ' and that a 'search and seizure' become unreasonable when the Government's activities violate 'the privacy upon which [a person] justifiably relie[s].' But in *Katz* the Court also stressed that '[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection.' 389 U.S., at 351, 88 S.Ct. 507, at

5. In *Commonwealth v. Polak*, 438 Pa. 67, 263 A.2d 354 (1970), this court quashed the subpoena therein because when it was issued, there was no existing matter or cause pending before the court. *Polak* would thus preclude the Commonwealth from claiming that the instant subpoena was lawful.

511, 19 L.Ed.2d at 582. We must examine the nature of the particular documents sought to be protected in order to determine whether there is a legitimate 'expectation of privacy' concerning their contents. Cf. *Couch v. United States*, 409 U.S. 322, 335, 93 S.Ct. 611, 619, 34 L.Ed.2d 548, 558 (1973).

"Even if we direct our attention to the original checks and deposit slips, rather than to the microfilm copies actually viewed and obtained by means of the subpoena, we perceive no legitimate 'expectation of privacy' in their contents. The checks are not confidential communications but negotiable instruments to be used in commercial transactions. All of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business. The lack of any legitimate expectation of privacy concerning the information kept in bank records was assumed by Congress in enacting the Bank Secrecy Act, the expressed purpose of which is to require records to be maintained because they 'have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings,' 12 U.S.C. § 1829b(a)(1). Cf. *Couch v. United States*, supra, at 335 [93 S.Ct. at 619, 34 L.Ed.2d 558].

"The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. *United States v. White*, 401 U.S. 745, 751–752 [91 S.Ct. 1122, 1125–1126, 28 L.Ed.2d 453, 458–459] (1971). This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed. Id., at 752, 91 S.Ct. 1122, at 1126, 28 L.Ed.2d, at 459; *Hoffa v. United States,* 385 U.S. [293], at 302, 87 S.Ct. 408, at 413, 17 L.Ed.2d 374, at 382; *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

"This analysis is not changed by the mandate of the Bank Secrecy Act that records of depositors' transactions be maintained by banks. In *California Bankers Assn. v. Shultz*, 416 U.S. [21] at 52–53, 94 S.Ct. 1494, at 1512, 39 L.Ed.2d 812, at 835–836, we rejected the contention that banks, when keeping records of their depositors' transactions pursuant to the Act, are acting solely as agents of the Government. But, even if the banks could be said to have been acting solely as Government agents in transcribing the necessary information and complying without protest with the requirements of the subpoenas, there would be no intrusion upon the depositors' Fourth Amendment rights. See *Osborn v. United States*, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966)." Id., at 442–43, 96 S.Ct., at 1623–1624 (Footnotes omitted)[6]

Appellant, however, bases her claim on Article I, § 8 of the Pennsylvania Constitution, which states:

"The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."

Further, in a footnote to *Commonwealth v. Harris*, 429 Pa. 215, 219 n. 2, 239 A.2d 290, 292 n. 2 (1968), we stated:

"However, the state has the power to impose standards on searches and seizures higher than those required by the Federal Constitution. See *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967)."

6. In November, 1978, the United States Congress passed the Financial Institutions Regulatory and Interest Rate Control Act of 1978. Act of November 10, 1978, P.L. 95–630 (effective 120 days after enactment date). In Title XI—the Right to Financial Privacy, Congress limited those procedures whereby federal authorities could obtain a customer's bank records, § 1102. Further, a customer is given the opportunity to challenge the legitimacy of any seizure, § 1110.

Since appellant bases her claim on state constitutional grounds, we find the following commentator's observations to be pertinent:

"State judges, however, need not ignore the reasoning of the United States Supreme Court in opinions rejecting a comparable federal constitutional claim. For a state court interpreting a state constitution, opinions of the United States Supreme Court are like opinions of sister state courts or lower federal courts. While neither binding in a constitutional sense nor precedential in a jurisprudential one, they are entitled to whatever weight their reasoning and intellectual persuasiveness warrant. One would expect a state court to deal carefully with a Supreme Court opinion and to explain forthrightly why it found itself constrained to reason differently. But such a difference in reasoning should be no more alarming than the differences which impel one judge to dissent from another's opinion, one court to disagree with another, or the judges of any court to disagree with a precedent established by their predecessors." Falk, The State Constitution: A More Than "Adequate" Nonfederal Ground, 61 Calif.L.Rev. 273, 283–84 (1973).[7]

As we believe that *Miller* establishes a dangerous precedent, with great potential for abuse, we decline to follow that case when construing the state constitutional protection against unreasonable searches and seizures.

■■ The protection provided by Article I, § 8, of the Pennsylvania Constitution extend to those zones where one has a reasonable expectation of privacy. As we stated in *Commonwealth v. White*, 459 Pa. 84, 89–90, 327 A.2d 40, 42 (1974):

". . . An individual's *effects* and *possessions* are constitutionally protected from unreasonable search and seizure as well as his person. U.S.Const. Amend. IV, Pa. Const. art. I, § 8. This protection does not depend on the

7. See Wilkes, The New Federalism in Criminal Procedure: State Court Evasion of the Burger Court, 62 Ky.L.J. 421 (1974); Wilkes, More of the New Federalism in Criminal Procedure, 63 Ky.L.J. 873 (1975).

physical presence or physical absence of the individual owner. 'So long as a person seeks to preserve his effects as private, even if they are accessible to . . . others, they are constitutionally protected. Stated differently, a person must maintain the privacy of his possessions in such a fashion that his "expectations of freedom from intrusion are recognized as reasonable." ' *Commonwealth v. Platou*, 455 Pa. 258, 266–267, 312 A.2d 29, 34 (1973), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974)." (Emphasis in original.)

In *U. S. v. Miller, supra,* the court held that a depositor had no reasonable expectation of privacy in records which the majority deemed to be records of the bank. The California Supreme Court, when deciding an identical issue under the California Constitution in *Burrows v. Superior Court of San Bernardino County*, 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590 (1974),[8] took a different view. As that court stated:

"It cannot be gainsaid that the customer of a bank expects that the documents, such as checks, which he transmits to the bank in the course of his business operations, will remain private, and that such an expectation is reasonable." Id., at 243, 118 Cal.Rptr., at 169, 529 P.2d, at 593.

As the court went on to explain:

". . . For all practical purposes, the disclosure by individuals or business firms of their financial affairs to a bank is not entirely volitional, since it is impossible to participate in the economic life of contemporary society without maintaining a bank account. In the course of such dealings, a depositor reveals many aspects of his personal affairs, opinions, habits and associations. Indeed, the totality of bank records provides a virtual current biography. While we are concerned in the present case only with bank statements, the logical extension of the

8. In *Burrows*, the bank therein turned over records upon an informal request of police. Whether the records are obtained pursuant to either an informal request and an invalid subpoena makes no difference on the analysis of the privacy issue.

contention that the bank's ownership of records permits free access to them by any police officer extends far beyond such statements to checks, savings, bonds, loan applications, loan guarantees, and all papers which the customer has supplied to the bank to facilitate the conduct of his financial affairs upon the reasonable assumption that the information would remain confidential. To permit a police officer access to these records merely upon his request, without any judicial control as to relevancy or other traditional requirements of legal process, and to allow the evidence to be used in any subsequent criminal prosecution against a defendant, opens the door to a vast and unlimited range of very real abuses of police power.

"Cases are legion that condemn violent searches and invasions of an individual's right to the privacy of his dwelling. The imposition upon privacy, although perhaps not so dramatic, may be equally devastating when other methods are employed. Development of photocopying machines, electronic computers and other sophisticated instruments have accelerated the ability of government to intrude into areas which a person normally chooses to exclude from prying eyes and inquisitive minds. Consequently judicial interpretations of the reach of the constitutional protection of individual privacy must keep pace with the perils created by these new devices." Id., at 247, 118 Cal.Rptr., at 172, 529 P.2d, at 596.

Further, the court stated:

". . . It is significant in this connection that the bank provided the statements to the police in response to an informal oral request for information about all of petitioner's accounts. Thus, the character, scope, and relevancy of the material obtained were determined entirely by the exercise of the unbridled discretion of the police. If this search may be deemed reasonable, nothing could prevent any law enforcement officer from informally requesting and obtaining all of a person's or business entity's records which had been confided to a bank, though such records might have no relevance to a crime, if any, under investigation; and those records could be introduced into evi-

dence in any subsequent criminal prosecution." Id., at 243, 118 Cal.Rptr., at 169, 529 P.2d, at 493.

We believe the analysis of the California Supreme Court, in recognizing modern electronic realities, is more persuasive than the simplistic proprietary analysis, supposedly rejected in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), used by the court in *Miller*. See *U. S. v. Miller, supra,* 425 U.S., at 447, 96 S.Ct. 1619 (Brennan, J., dissenting.) See also *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

The Commonwealth, on the other hand, urges us to reject *Burrows* for three reasons, none of which we believe to be persuasive. The Commonwealth first argues that adopting *Burrows* would adversely affect the negotiability of checks. As the Commonwealth states in its brief:

". . . If a customer issues a check to a merchant, the expectation of privacy of the issuer may effectively curtail the merchant from negotiating the check to his supplier and so forth, the result of which would undermine the entire system which depends on free negotiability of instruments. It is difficult to perceive how an issuer of check, with no control over whom the check may be negotiated to, could claim any privacy interest."

We believe that the drawer of a check, to a limited extent, gives up his right to privacy in that check while that check is circulated in commercial channels.

As one commentator, however, has stated:

". . . the bank customer does not waive his privacy right by public exposure of the microfilm composite, *although he may have done so in regard to the limited information contained on a single negotiable instrument placed in public commerce.*[80] Exposing the parts to sundry unrelated people is not equivalent to exposing the whole to one's bank for limited business purposes.[81]

"[80] The payee or endorsee of any one check is likely to be a stranger to the drawer, who neither comprehends nor cares about this check's significance as part of a pattern of activity.

"[81] Although a bank employee may see a customer's checks in bundles, the employee and customer are often unaware of the

other's private life. In addition, brief business exposure is probably insufficient to permit the careful examination necessary to construct accurate conclusions about the customer's lifestyle." 14 San Diego L.Rev. 414, 425 (1977). (Emphasis added.)

Further, as the Court stated in *Burrows, supra,* 13 Cal.3d, at 244, 118 Cal.Rptr., at 170, 529 P.2d, at 592:

". . . The disclosure by the depositor to the bank is made for the limited purpose of facilitating the conduct of his financial affairs; it seems evident that his expectation of privacy is not diminished by the bank's retention of a record of such disclosures."

Thus, using what we believe to be a realistic approach to modern economic realities, we do not believe our .decision will in any way affect the negotiability of checks.

■ The Commonwealth next argues that adopting *Burrows* would amount to this court's creation of banker-customer privileges, a task which should be left to the Legislature. We do not believe, however, that our decision in any way creates such a privilege, as the holder of any of the traditionally recognized privileges cannot be compelled to waive said privilege. A bank could always be compelled to turn over customer's records when served with a valid search warrant or some other type of valid legal process, such as a lawful subpoena.

The Commonwealth finally argues that *Burrows* is inapplicable because the California Constitution contains the following provision:

"All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring possessing and protecting property, and pursuing and obtaining safety, happiness and *privacy.*" West's Ann.Cal.Const. Art. 1, § 1 (Emphasis added.)

The Commonwealth believes that since the Pennsylvania Constitution contains no explicit provision pertaining to the right to privacy, *Burrows* should not be followed.- We do not agree.

In *Commonwealth v. Platou,* 455 Pa. 258, 312 A.2d 29 (1973), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), which judgment rests on an adequate state ground, we held that the right to be free from unreasonable searches and seizures contained in Art. I, § 8, of the Pennsylvania Constitution is tied into the implicit right to privacy in this Commonwealth. See *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) and *In re B,* 482 Pa. 471, 394 A.2d 419, 425 (1978).

We thus are not persuaded by the arguments advanced by the Commonwealth that we should reject the analysis of the California Supreme Court in *Burrows.* We are convinced that under Art. I, § 8, of the Pennsylvania Constitution bank customers have a legitimate expectation of privacy in records pertaining to their affairs kept at the bank. Since the records seized in the instant case were taken pursuant to an invalid subpoena, and appellant had a legitimate expectation of privacy in those records, appellant has standing to challenge their admissibility.

The Commonwealth argues that the admission of the evidence in question was harmless error as to the murder conviction, as the evidence went only to the attempted extortion and forgery charges. This argument ignores the fact that the evidence was introduced at appellant's murder trial to show motive. As such, the judgment of sentence for murder of the third degree must be reversed.

We believe, however, that the judgment of sentence for attempted theft by extortion must be affirmed. At the nonjury trial on the forgery and attempted extortion charges, appellant admitted purchasing the typewriter with the check seized pursuant to the invalid subpoena. Appellant further admitted to typing the extortion note, but attempted, unsuccessfully, to show that she withdrew from the plot.

At the trial on the attempted extortion charges, however, the check used to purchase the typewriter was not introduced. The only reference to the check occurred in the following exchange:

"Q. [Assistant District Attorney]: I direct your attention to what has been marked as Commonwealth's Exhibit 2 and ask you if you know what that is?

"A. [Witness]: Yes. That is a Bill of Sale to Jill DeJohn on the Olympiette portable typewriter, Serial Numbers 2008610 and 9950, and supplies 1707.

"The total bill was $123.57, which was paid by check no. 988, drawn on Mellon National Bank."

Appellant failed to object to the mention of the check. Further, on this appeal, appellant has not argued that the typewriter and bill of sale were the fruits of a poisonous tree, i. e., obtained only because of the illegally seized check. Thus, as the illegally seized check was not introduced into evidence at the nonjury trial and no fruit of the poisonous tree argument is advanced, we can find no reason to disturb the attempted theft by extortion conviction.

Judgment of sentence at No. 184 March Term, 1977 is reversed and the case is remanded for a new trial. Judgment of sentence at No. 192 March Term, 1977 is affirmed.[9]

ROBERTS, J., files a concurring opinion.

LARSEN, J., files a concurring and dissenting opinion.

MANDERINO, J., files a dissenting opinion.

POMEROY, former J., took no part in the consideration or decision of this case.

ROBERTS, Justice, concurring.

I agree with the Court that appellant's conviction on the charge of attempted extortion should be affirmed.

I also agree with Mr. Justice Manderino that the evidence is insufficient to sustain a conviction against appellant for murder of the third degree. Since that view, however, does not prevail, I conclude that in the alternative appellant is at least entitled to a new trial because appellant's prior bad acts and criminal conduct were improperly admitted, over

9. Given our resolution of the above issues, we need not decide appellant's other allegations of error.

objection, into evidence. I join the majority in granting a new trial.

Evidence of a defendant's prior criminal conduct or other bad acts is highly prejudicial and generally is not admissible. The Commonwealth, however, argues that its evidence that appellant engaged in forgery and attempted extortion was admissible since it was introduced to establish appellant's motive for the crime with which she was charged. See e. g., *Commonwealth v. Stanley,* 484 Pa. 2, 398 A.2d 631 (1979); *Commonwealth v. Roman,* 465 Pa. 515, 351 A.2d 214 (1976); McCormick, Evidence, 2d ed. §§ 190 et seq.

In support of this argument, the Commonwealth offers as a possible motive appellant's fear that her husband might learn of the extent of their debts. On this view, appellant's inability in the days before the murder to raise sufficient funds to meet their financial needs made the unwanted revelation appear imminent and provoked appellant's murder of her husband. On this theory, only unsuccessful attempts to raise funds would provide appellant with a motive for murder; successful attempts would be irrelevant. And yet, arguing that it fell within the "motive exception," the prosecution introduced evidence meant to show that three months before DeJohn's death, appellant successfully obtained a bank loan by forging her husband's signature on the loan application. The evidence of deceit in the bank transaction could serve only to impeach appellant's character and improperly prejudice the jury against appellant. Given the inapplicability of the Commonwealth's theory of motive to this successful attempt at raising funds, it is clear that the prejudicial effect of the evidence of forgery significantly outweighed its probative value. The evidence of forgery was not relevant and its introduction constituted reversible error.

The Commonwealth also introduced evidence that appellant unsuccessfully attempted to extort money from a neighbor several days before DeJohn's death. The Commonwealth argues that the failure of this attempt to raise funds provoked the killing. But the Commonwealth has failed to

present any evidence that the victim's expected response to disclosure of his financial situation would have been in any way so extraordinary as to provoke his wife to murder him to avoid it. Evidence of prior crimes is only admissible where there is a logical connection between the two crimes such that knowledge of the perpetrator of the former establishes the perpetrator of the latter. E.g., *Stanley,* supra; *Commonwealth v. Patterson,* 484 Pa. 374, 399 A.2d 123 (1979). The record does not establish that appellant and her husband had an unsuccessful marriage, or that the debts of the DeJohns were caused by appellant alone. Rather, it appears from the record that the difficult financial position of appellant and her husband arose from the relatively extravagant spending habits shared by husband and wife. On this record there is no logical connection between the two crimes of which appellant was accused. Thus the extremely prejudicial evidence of attempted extortion is not relevant to determining the identity of the murderer of Michael DeJohn and its admission also was reversible error.

The presence in this record of reversible evidentiary errors makes it unnecessary to decide whether the customer of a bank has a protectable interest in the privacy of his bank accounts, apparently a constitutional question of first impression in this jurisdiction. Because the majority addresses this question, however, I wish to note my disagreement with the majority's analysis. Certainly bank customers have standing to challenge the introduction of bank records into evidence against them. The nature of the commercial relationship between banks and their customers is such that a customer's interest in the integrity of his bank account is in my view something less than a constitutional right of privacy and something more than a confidential relationship. What is necessary to protect the interests of all involved is a rule not only in harmony with the economic and commercial necessities of today, but one which is sensitive, as well, to the legitimate needs of those charged with enforcing the laws for access to commercial banking records. Cf. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)

(probable cause not necessary for lawful police stop) and *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (arbitrary police stop of vehicles unlawful). The protection of the interests of the depositors, financial institutions, and effective law enforcement demands that bank records be made available upon compliance with proper legal process. Thus, at this stage of our commercial and jurisprudential development this Court can, in an appropriate case, fashion a decisional rule which protects both the need for confidential and responsible treatment of the depositor's account and the need for effective law enforcement.

LARSEN, Justice, concurring and dissenting.

I concur in the affirmance of the judgment of sentence for attempted theft by extortion. I dissent to the reversal of the judgment of sentence on the conviction of murder of the third degree and in support of my dissent I submit the following:

## I. RIGHT TO PRIVACY

I would hold, on the basis of Article I, Section 8, of the Pennsylvania Constitution, that a depositor does not have a reasonable expectation of privacy in a checking account and thus the appellant, Jill V. DeJohn, has no standing to attack the lawfulness of the seizure of the bank records. Thus the trial judge was correct in denying appellant's motion to suppress. In support thereof I cite and adopt the rationale of *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) wherein the United States Supreme Court stated that, on the basis of the United States Constitution:

"Even if we direct our attention to the original checks and deposit slips, rather than to the microfilm copies actually viewed and obtained by means of the subpoena, we perceive no legitimate 'expectation of privacy' in their contents. The checks are not confidential communications but negotiable instruments to be used in commercial transactions. All of the documents obtained, including financial statements and deposit slips, contain only infor-

mation voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business. The lack of any legitimate expectation of privacy concerning the information kept in bank records was assumed by Congress in enacting the Bank Secrecy Act, the expressed purpose of which is to require records to be maintained because they 'have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings,' 12 U.S.C. § 1829b(a)(1). *Cf. Couch v. United States, supra* [409 U.S.] at 335, 93 S.Ct. [611,] 619, 34 L.Ed.2d [548,] 558.

"The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. *United States v. White,* 401 U.S. 745, 751–752, 91 S.Ct. 1122, 1125–1126, 28 L.Ed.2d 453, 458–459 (1971). This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed. *Id.* at 752, 91 S.Ct. [1122,] at 1126, 28 L.Ed.2d at 459; *Hoffa v. United States,* 385 U.S. 293 at 302, 7 S.Ct. [408,] at 413, 17 L.Ed.2d at 462; *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963)".

## II. THE EXCLUSIONARY RULE

I believe there is an equally compelling reason for affirming the trial court's denial of appellant's motion to suppress the evidence obtained pursuant to the subpoenas. It is my opinion that the exclusionary rule should not be applied in this case to bar the admission of that evidence even if, as the majority concludes, it was obtained in violation of Article I, Section 8 of the Pennsylvania Constitution.

Since *Miller* would not bar the use of the bank evidence under the Fourth Amendment of the United States Constitution, we are concerned solely with the Pennsylvania Constitution. Prior to *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684,

6 L.Ed.2d 1081 (1961), Pennsylvania was one of the 24 states which, at that time, admitted evidence in a criminal trial without regard for the manner in which it was obtained, provided it was relevant, not privileged and competent. Lowe, *A Summary of Pennsylvania Law on Search and Seizure*, 2–4 (1975); *see Commonwealth ex rel. Wilson v. Rundle*, 412 Pa. 109, 118, 194 A.2d 143, 147 (1963). To the best of this writer's knowledge, this Court has never fully considered whether the Pennsylvania Constitution itself compels exclusion of evidence obtained in violation thereof. It is therefore appropriate to examine the exclusionary rule as the remedy for violations of Article I, Section 8. This opinion does not purport to exhaust all of the myriad facets and nuances of the exclusionary rule, merely to highlight some of the major themes, and to suggest a framework for judicial and legislative modification and supplementation of the rule.

A.   Development of the Exclusionary Rule

Not until 1914 did the United States Supreme Court hold that the Fourth Amendment alone may be the basis for excluding from a federal criminal trial evidence seized by a federal officer in violation of that Amendment.[1]  *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). In 1949, that Court held that the Fourth Amendment was applicable to the states because of the Due Process Clause of the Fourteenth Amendment, but declined to require application of the exclusionary rule to state criminal proceedings. *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). In refusing to apply the *Weeks* doctrine to the states that Court held:

> "Granting that in practice the exclusion of evidence may be an effective way of deterring unreasonable searches, it is not for this Court to condemn as falling below the minimal standards assured by the Due Process Clause a

1.   An exclusionary rule had been fashioned earlier in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) as a remedy for simultaneous violations of both the Fourth and the Fifth Amendments.

State's reliance upon other methods which, if consistently enforced, would be equally effective." 338 U.S. at 31, 69 S.Ct. at 1362–1363.

Twelve years later, that Court concluded that equally effective alternatives to the exclusionary rule had simply not been developed by the states and that the Fourteenth Amendment required that, in order to prevent the atrophy of Fourth Amendment rights, evidence obtained as a result of an unreasonable search or seizure would be inadmissible in a state criminal proceeding. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

Few judicial announcements have engendered more passionate debate, both within the judiciary, *see, United States v. Janis*, 428 U.S. 433, 446 n.15, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), and among legal commentators, *see, e. g.* Kasimar, *Is the Exclusionary Rule an 'Illogical' or 'Unnatural' Interpretation of the Fourth Amendment?*, 62 Judicature 66 (1978) (hereinafter *Kasimar*), and Wilkey, *The Exclusionary Rule: Why Suppress Valid Evidence?*, 62 Judicature 215 (1979) (hereinafter *Wilkey*), and closing arguments by these same two authors, Kasimar, *The Exclusionary Rule in Historical Perspective: the Struggle to make the Fourth Amendment More Than 'an Empty Blessing'*, 62 Judicature 337 (1979) (hereinafter *Historical Perspective*) and Wilkey, *A Call for Alternatives to the Exclusionary Rule: Let Congress and the Trial Courts Speak*, 62 Judicature 351 (1979) (hereinafter *Call for Alternatives*). Few issues have produced more legal commentary, as a glance through the Index to Legal Periodicals readily reveals. The mere volume of commentary indicates the difficulty of the problem caused by the countervailing interests involved. (As Justice Cardozo stated "[o]n the one side is the social need that crime shall be repressed. On the other, the social need that law shall not be flouted by the insolence of office. *There are dangers in any choice.*" *People v. Defore*, 242 N.Y. 13, 150 N.E. 585, 589 (1926) (emphasis added).)

## B. Criticisms of the Exclusionary Rule

The major criticism of the rule is that it distorts the fact-finding process of the criminal trial since "as is nearly always the case with the rule, concededly relevant and reliable evidence [is] rendered unavailable." *United States v. Janis, supra* 428 U.S. at 447, 96 S.Ct. at 3029; *Wilkey, supra* at 220–21; Geller, *Enforcing the Fourth Amendment: The Exclusionary Rule and Its Alternatives*, 1975 Wash.U. L.Q. 621, 674 (1975) (hereinafter *Geller*); Levin, *An Alternative to the Exclusionary Rule for Fourth Amendment Violations*, 58 Judicature 74 (1974). It is also argued that the rule protects only those guilty of a crime (since the evidence is frequently dispositive of guilt) while doing nothing for the innocent (who are not charged with crimes but whose rights have just as surely been violated). *Wilkey, supra* at 223; Davidow, *Criminal Procedure Ombudsman As a Substitute for the Exclusionary Rule: A Proposal*, 4 Tex.Tech.L.Rev. 317, 318–19 (1973).

Further, the exclusionary rule operates only in those cases where the object of the police conduct is directed at obtaining a conviction. In a significant percentage of cases, non-prosecutorial goals are sought by law enforcement officials. These include harassment, confiscation of illegal items (simply to get them "off the streets") or small "pinches" to use as leverage to get the victim of the seizure to inform on his supplier or superior. *Geller, supra* at 66; *Davidow, supra* at 319; Skolnick, *Justice Without Trial*, Ch. 6 (1967); Roche, *A Viable Substitute for the Exclusionary Rule: A Civil Rights Appeals Board*, 30 Wash. & Lee L.Rev. 223, 225 (1973) (hereinafter *Roche*). Since in these cases, the person who is the object of unlawful police activity is not prosecuted or brought to trial, the threat of excluding evidence can have little or no deterrent effect, for it deprives the wrongdoer of no benefit. Coe, *The ALI Substantiality Test: A Flexible Approach to the Exclusionary Sanction*, 10 Ga.L.Rev. 1, 19 (1975) (hereinafter *Coe*).

Recently, the most severe criticism is that the rule simply does not work to achieve its purposes, *see* studies cited in *United States v. Janis, supra* at 450–52, n.22, 96 S.Ct. 3021,

and that, given its universally recognized social costs, *id.* at 448–49, 96 S.Ct. 3021, it should therefore be abandoned or its scope restricted.

## C. Purposes of the Exclusionary Rule

It is generally conceded that there are two purposes behind the adoption of the exclusionary rule: deterrence of unlawful police conduct and the maintaining of what has come to be known as the "imperative of judicial integrity" (that is, judicial integrity would suffer if the courts were to admit evidence illegally obtained). Oaks, *Studying the Exclusionary Rule in Search and Seizure*, 37 U.Chi.L.Rev. 665, 669 (1970) (hereinafter *Oaks*); *Kasimar, supra* at 67. Recent United States Supreme Court decisions, however, suggest that deterrence is the primary, if not the sole justification for the rule. *United States v. Janis, supra* at 446, 96 S.Ct. 3021; *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); see *Commonwealth v. Brown*, 470 Pa. 274, 282, 368 A.2d 626, 630 (1976) and *Commonwealth ex rel. Wilson v. Rundle*, 412 Pa. 109, 118, 194 A.2d 143, 148 (1963). Many empirical studies, by both defenders and detractors of the rule, have been conducted in an attempt to demonstrate a correlation, or lack thereof, between the application of the exclusionary rule and deterrence of police activities violative of the Fourth Amendment. *See United States v. Janis, supra*, 428 U.S. at 450–52, 96 S.Ct. 3021. Analysis of the studies prompted the United States Supreme Court to observe "[t]he final conclusion is clear. No empirical researcher, proponent or opponent of the rule, has yet been able to establish with any assurance whether the rule has a deterrent effect . . . ." *Id.*, at n.22. This conclusion, however, is not shared by all, see, e. g., Canon, *The Exclusionary Rule: Have Critics Proven That It Doesn't Deter Police*, 62 Judicature 398 (1979) (hereinafter *Canon*); *Kasimar, supra* at 70–73. In the final analysis, it may well be that the effect of the exclusionary rule is simply not susceptible to empirical proof. *Call for Alternatives, supra* at 353; Cri-

tique, *On the Limitations of Empirical Evaluations of the Exclusionary Rule: A Critique of the Spiotto Research and United States v. Calandra*, 69 Nw.L.Rev. 740 (1974); *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 416, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, C. J., dissenting); *United States v. Janis, supra*, 428 U.S. at 449–53, 96 S.Ct. 3021, but *cf.* n.26 at 453, 96 S.Ct. 3021. At any rate, it seems clear that any proof of the efficacy of the rule is far from convincing.[2]

While, as noted, recent decisions of the United States Supreme Court have downplayed the significance of the maintenance of the "imperative of judicial integrity"[3] as a rationale for the rule, earlier decisions seemed to place considerable emphasis on that purpose. Justice Holmes and Brandeis have made the most eloquent statements of this purpose in *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). Holmes said:

"the government ought not to use evidence obtained and only obtainable by a criminal act. . . . We have to choose, and for my part I think it a less evil that some criminals should escape than that the Government should play an ignoble part.

For those who agree with me no distinction can be taken between the Government as prosecutor and the Government as judge." *Id.* at 470, 48 S.Ct. at 575 (Holmes, J., dissenting).

And Brandeis expounded the following:

"If this court should permit the government by means of its officers' crimes, to effect its purpose of punishing the

---

**2.** The significance of this point is dependent upon who is perceived to have the burden of proving that the exclusionary rule accomplishes its goal of deterrence. Given the undeniable social costs of its application, many commentators place the burden on those who maintain these costs are justified by the supposed benefits of the rule. *E.g.*, Schlesinger, *The Exclusionary Rule: Have Proponents Proven That It Is A Deterrent to Police*, 62 Judicature 404, 404–05 (1979); *Stone v. Powell*, 428 U.S. 465, 496, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (Burger, C. J., concurring).

**3.** *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

defendants, there would seem to be present all the elements of a ratification. . . .

\* \* \* \* \* \*

Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. . . . If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." *Id.* at 483–85, 48 S.Ct. at 575 (Brandeis, J., dissenting).

In contrast to the recent views of the majority of the United States Supreme Court, there are many authors and some courts who still treat the "imperative of judicial integrity" as a viable basis for the exclusionary rule, *see, e. g. Kasimar, supra*; Allen, *The Judicial Quest for Penal Justice : The Warren Court and the Criminal Cases*, 1975 U.Ill.L.F. 518, 536–37 (1975); *Board of Selectmen v. Municipal Court*, 369 N.E.2d 1145, 1148–49 (1977 Mass.Sup.Judicial Ct.) ("judicial integrity" found determinative in applying exclusionary rule to civil proceeding involving the government), at least in certain categories of cases, *Coe, supra* at 17.

D. Application of the Exclusionary Rule

Presently, application of the exclusionary rule is an all or nothing proposition—if evidence has been obtained as a result of an unreasonable search and seizure, that evidence will be excluded from the criminal prosecution—regardless of the severity of the deprivation of Fourth Amendment rights.[4] "It does not matter whether the action of the officer was grossly wilful and flagrant or whether he was conscientiously using his very best judgment under difficult circumstances; the result is the same: the evidence is out." *Wilkey, supra* at 226. Similarly, no distinction is made between relatively minor intrusions upon a person's reasona-

---

4. Assuming, of course, that the victim has the requisite standing to challenge the admissibility of the evidence and that the evidence has not been "purged of its primary taint." *Commonwealth v. Shaw*, 476 Pa. 543, 383 A.2d 496, 501–02 (1978) citing *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

ble expectations of privacy and severe infringement of those expectations. *Id.* However, the current trend of judicial and scholarly thought recognizes that situations exist where the doctrines of neither deterrence nor the preservation of judicial integrity are served by the mechanical and absolute application of the rule, and, consequently, that its application should be limited to those cases where the rule's purposes have significant potential for fulfillment. *E. g., Stone v. Powell, supra,* 428 U.S. at 497, 536–542, 96 S.Ct. 3037 (Burger, C. J., concurring; White, J., dissenting); Weber, *Good Faith of Peace Officers in Search and Seizure: Seeking Proper Limits to the Exclusionary Rule,* 53 L.A.B.J. 307 (1977) (hereinafter *Weber*); Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 408–09 (1974) (hereinafter *Amsterdam*); *Geller, supra* at 648; *Coe, supra.*

"The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice." *Stone v. Powell, supra* at 490, 96 S.Ct. at 3050. Courts should apply rationally graded responses to deprivations of Fourth Amendment, and Article I, Section 8, rights, rather than the indiscriminate and automatic exclusion of evidence. Such responses would acknowledge that "so serious an infringement with the crucial truth-seeking function of a criminal prosecution should be allowed only when imperative to safeguard constitutional rights." *Brewer v. Williams,* 430 U.S. 387, 422, 97 S.Ct. 1232, 1251, 51 L.Ed.2d 424 (1977) (Burger, C. J., dissenting).

What are the situations where application of the rule would not further its avowed purposes? Examples include the case where a police officer acts in good faith reliance on probable cause decisions of an appellate court in effect at the time of the search or seizure, but, prior to trial or the suppression hearing, the law changes sufficiently to require the court to hold that no probable cause existed. *See, e. g., Weber, supra* at 310. Another example is where law en-

forcement agents have probable cause to conduct a search, secure a warrant and execute it in a reasonable manner, but the warrant subsequently proves defective for some reason not related to any bad faith on the part of the authorities. *See, e. g., Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (warrant invalid because not issued by neutral and detached magistrate). In such situations, the deterrence argument loses what persuasiveness it has because, as expressed by Justice White of the United States Supreme Court in *Stone v. Powell* :

> "[I]t is painfully apparent that in [these situations] the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty. It is true that in such cases the courts have ultimately determined that in their view the officer was mistaken; but it is also true that in making constitutional judgments under the general language used in some parts of our Constitution, including the Fourth Amendment, there is much room for disagreement among judges, each of whom is convinced that both he and his colleagues are reasonable men. Surely when this Court divides five to four on issues of probable cause, it is not tenable to conclude that the officer was at fault or acted unreasonably in making the arrest.
>
> When law enforcement personnel have acted mistakenly, but in good faith and on reasonable grounds, and yet the evidence they have seized is later excluded, the exclusion can have no deterrent effect." 428 U.S. at 539–40, 96 S.Ct. at 3073 (dissenting).

That Court has recognized that the existence of good faith significantly reduces the deterrent effect of exclusion. *See Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) and *United States v. Peltier*, 422 U.S. 531, 537–38, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975).

Likewise the "imperative of judicial integrity" is not served by application of the exclusionary rule to such situa-

tions—in fact, the image of judicial responsibility may be severely tarnished by automatically applying the doctrine. "The layman finds [the judicial integrity rationale] difficult to grasp, and many lawyers think the highest integrity of the adjudicative aspect of the criminal process lies in the separation of the guilty from the innocent on the basis of all the relevant evidence available." McGowan, *Rulemaking and the Police*, 70 Mich.L.Rev. 659, 674 (1972) (hereinafter *McGowan*). Where the exclusionary rule is applied without regard to the seriousness of the unlawful conduct or the culpability of the offender, "it may well have the opposite effect of generating disrespect for the law and administration of justice." *Stone v. Powell, supra*, 428 U.S. at 491, 96 S.Ct. at 3051; *Schlesinger, supra* at 405; *Coe, supra* at 25–26. Where the Fourth Amendment or Article I, Section 8, violation is a relatively minor transgression, judicial integrity would seem best aided, therefore, by non-application of the suppression doctrine.[5] Where, however, the police misconduct is wilful, egregious, reckless or grossly negligent, and the invasion of privacy is serious, the scales of the balance tip in favor of excluding the evidence. *See Coe, supra* at 31. The public is less likely to perceive the exclusionary rule as a mere "technicality" in these circumstances, or to perceive the court's role as one of catering to criminals. Of course, the courts should not place *undue* reliance on "transient public opinion polls" on sensitive issues as we have always accorded to law an educative, as well as a regulatory function. *McGowan, supra* at 660. Yet we must not insulate ourselves from the public perspective for, as Holmes stated, "[t]he first requirement of a sound body of law is, that it should correspond with the actual feelings and demands of the community. . . ." Holmes, *The Com-*

---

5. It should also be noted that "judicial integrity" "does not mean that the courts must never admit evidence obtained in violation of the Fourth Amendment. The requirement that a defendant must have standing to make a motion to suppress demonstrates as much. *See Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)." *United States v. Janis, supra*, 428 at 458, n.35, 96 S.Ct. at 3034.

*mon Law* 41 (1938). In other words, justice should be rooted in, and emanate out of, the culture (community).

### E. Proposals for Modification

There are several proposals for modification of the rule which attempt to balance the collective needs of the community and the individual rights of its citizens. One suggestion is that evidence be suppressed only where the errant law enforcement activity is intentional, reckless or grossly negligent. *Geller, supra* at 648. Another is that a so-called good-faith defense be adopted such that where the police have acted mistakenly, but in good-faith and on "reasonable" grounds,[6] the evidence should not be suppressed. *Stone v. Powell, supra,* 428 U.S. at 536–42, 96 S.Ct. 3037 (White, J., dissenting); *Weber, supra.* The American Law Institute takes the position that evidence should be excluded only where the violation committed in acquiring it was "substantial." Where the violation was "gross, wilful and prejudicial", it would be "deemed" substantial. In all other cases, various factors would be examined and weighed, and the trial court would determine whether the circumstances demonstrated a "substantial" violation. Circumstances to be considered in determining whether a violation is substantial are:

    (a) the extent of deviation from lawful conduct;

    (b) the extent to which the violation was wilful;

    (c) the extent to which privacy was invaded;

    (d) the extent to which exclusion will tend to prevent violations of this Code;

    (e) whether, but for the violation, the things seized would have been discovered; and

    (f) the extent to which the violation prejudiced the moving party's ability to support his motion, or to defend

---

**6.** "Reasonable" in this context might mean that the law enforcement agent's interpretation of the conduct involved (as being non-violative of constitutional prohibitions) is at least of "arguable merit." (as where an appellate court splits 5–4 or 4–3 on the issue of whether or not a search and seizure violated constitutional restrictions.)

himself in the proceeding in which the things seized are sought to be offered in evidence against him.[7]

I favor the ALI model prohibiting introduction of evidence only when the violation by which it was obtained was "substantial" and would vote to adopt this modified version of the exclusionary rule as the law of this Commonwealth under Article I, Section 8, of the Pennsylvania Constitution.[8] "By laying down certain reasoned parameters within which exclusion is to operate . . . the substantiality test has the potential for preserving the exclusionary sanction within

7. The ALI Model Code of Pre-Arraignment Procedure § SS290.2 (Proposed Official Draft 1975) provides in relevant part:

"(2) *Determination.* A motion to suppress evidence pursuant to this section shall be granted only if the court finds that the violation upon which it is based was substantial or if otherwise required by the Constitution of the United States or of this State.

If the court finds a violation not to be substantial it shall set forth its reasons for such finding.

(3) *Violations Deemed Substantial.* A violation shall in all cases be deemed substantial if it was gross, wilful and prejudicial to the accused. A violation shall be deemed wilful regardless of the good faith of the individual officer if it appears to be part of the practice of the law enforcement agency or was authorized by a high authority within it.

(4) *Circumstances to Be Considered in Determining Substantiality.* In determining whether a violation not covered by Subsection (3) is substantial, the court shall consider all the circumstances including: [see text above listing six factors, (a)–(f)]

8. An inherent difficulty with all of these approaches is that each introduces in varying degrees, a subjective element—the state of mind of the law enforcement officer. Many scholars express concern that a great deal of fabrication of search and seizure events by police occurs now, at the suppression hearings. *Wilkey, supra* at 226, n.41. This problem would be exacerbated by the introduction of a subjective element. However, it is possible to construct safeguards such as: placing the burden of proof on the prosecution to demonstrate beyond a reasonable doubt that the unlawful conduct was undertaken in good faith, albeit mistakenly; or by stricter judicial scrutiny of the record including credibility; or by requiring objective evidence corroborating the actor's assertions of good faith. *See Weber, supra.* Under the ALI approach, the subjective intent of the offender is only one of the factors considered in the determination.

It is suggested that subjective criteria often enter into an appellate court's decisions *sub silentio* by subtle distortions of the standing doctrines and the substantive law of search and seizure in order to avoid application of the exclusionary rule in cases where the viola-

a scope that is both rational and effective in carrying out the purposes for which it was originally invoked, and at the same time politically and socially acceptable." *Coe, supra* at 51. Applying these standards to the case at bar, I would affirm the lower court's denial of appellant's motion to suppress:

(a) *The extent of deviation from lawful conduct.* The deviation from lawful conduct was not extreme, indeed, the conduct was sanctioned by the United States Supreme Court when that Court held, in *Miller*, that there is no intrusion on the bank depositor's Fourth Amendment rights.[9] On the continuum of unlawful conduct, the law enforcement practice in this case falls far short of the sort of activity condemned in *Mapp v. Ohio* which would be on the high end of the spectrum; [10]

(b) *The extent to which the violation was wilful.* While there was no evidence that the investigating officers or the

tion is comparatively slight and the unlawful conduct was committed in good faith. *See Coe*, supra at 38.

**9.** While *Miller* was couched in standing language, the holding was predicated on the finding that there was no "reasonable expectation of privacy" involved, and thus, no intrusion upon protected interests. As was recognized in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the doctrine of standing and the substantive law of search and seizure are "invariably intertwined." Justice Rehnquist noted for the majority that "we are not at all sure that the determination of a motion to suppress is materially aided by labeling the inquiry . . . as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress has had his own Fourth Amendment rights infringed . . . ." *Id.* 99 S.Ct. 425.

**10.** In *Mapp*, several police officers went to Miss Mapp's residence, allegedly searching for a bombing suspect, and demanded entrance. On the advice of her attorney, she refused to let them in without a warrant. Several hours later, seven police officers forcibly broke into the residence over the objections of the attorney who was present by that time (and who the officers would not permit to see his client), ransacked the entire residence, physically man-handled Miss Mapp, and seized evidence totally unrelated to the bombing incident. While one of the officers held up a paper claimed to be a warrant, no warrant was ever introduced at trial and there was "serious doubts" whether one ever existed. There is no question that this conduct would constitute a "substantial violation" under the ALI model.

assistant district attorney (who advised that the subpoena procedure was proper) acted in bad faith or intended to violate appellant's right to privacy, the record is inconclusive on the wilfulness of the deviation;

(c) *The extent to which privacy was invaded.* Again, the invasion of privacy must be seen as on the low end of the continuum. What is involved here are records at a commercial banking institution, not a private residence;

(d) *The extent to which exclusion will tend to prevent violations of this Code.* To a certain extent, this factor is dependent upon the wilfulness of the violation since, as we have seen, the rationale of prevention of future violations (deterrence) is of dubious validity when applied to unintentional, "reasonable" enforcement procedures. In the absence of bad faith, and in light of the fact that a majority of the United States Supreme Court in *Miller* did not disapprove the sort of activity herein involved (and that the police and the assistant district attorney could "reasonably" reach the same conclusion as did the *Miller* court), it would appear that deterrence would not be appreciably advanced by excluding the evidence;

(e) *Whether, but for the violation, the things seized would have been discovered.* Had the subpoenas been issued after trial had commenced, they would have been lawful, *Commonwealth v. Polak*, 438 Pa. 67, 263 A.2d 354 (1970), and the evidence could have been obtained at that time. Additionally, there were search warrants issued prior to the subpoenaing of the bank records which warrants authorized the search of appellant's house. These warrants were, contrary to appellant's assertion, supported by probable cause, when the affidavit accompanying the warrants is given a common-sense reading, *Commonwealth v. Muscheck*, 460 Pa. 590, 334 A.2d 248 (1975).[11] The information supplying probable cause

11. The victim of the attempted extortion, Mrs. Joan Badzgon, was identified as the source of some of the information in the affidavit which raised the inference that appellant was the writer of the extortion letter. Information from other named sources corroborated Mrs. Badzgon by suggesting motive for the extortion. Without engaging in a protracted analysis of probable cause to search, and

to search appellant's house could also have provided probable cause for a search warrant to obtain the bank records. Thus, the evidence probably would have been discovered without the search and seizure violation;

(f) *The extent to which the violation prejudiced the moving party's ability to support his motion, or to defend himself in the proceeding in which the things seized are sought to be offered in evidence against him.* Appellant's ability to support her motion or to defend herself does not seem to be any more or less prejudiced than in any other search and seizure case. Of course, in all cases the mere fact that incriminating evidence is seized is prejudicial to a defendant's defense. This factor would be more important where the evidence seized in and of itself established guilt, i. e., in possession crimes.[12]

Considering the totality of the circumstances and all the above factors, any violation of the rights guaranteed appellant by Article I, Section 8, was not "substantial" and, therefore, the evidence was properly admitted.[13]

realizing that extortion charges are frequently dependent upon inferences from circumstantial evidence, the warrants seem to have been supported by probable cause to suspect evidence of extortion would be found.

12. The role of factor (f) as it pertains to search and seizure cases is somewhat uncertain. According to Coe, a researcher who assisted the chief ALI reporter on this project, factor (f) was introduced initially in analogous "substantial violation" provisions concerning other areas of criminal suppression procedure, namely confessions and identification testimony. Coe suggests that (f) was retained in the search and seizure provision for the sake of symmetry, but that it is much less important in search and seizure suppression motions than in the other areas. *Coe, supra* at 34.

13. Subsection (3) of the ALI model, the *per se* or "deemed" violation provision, is not relevant because the violation could not be considered to be "gross." *See* discussion of factors (a) and (c) in text.
The comments to §§ 290.2 indicate that the circumstances of the instant case would not constitute a "substantial" violation. "[D]efects in the issuing process or the contents of the warrant do not support a motion to suppress unless they are of such magnitude as to trigger the "probable cause" and "particularly describing" limitations of the Fourth Amendment." Official Comments to §§ 290.2, at 564.

F. Alternatives to the Exclusionary Rule

Modification of the exclusionary rule would mean that some of the victims of unlawful searches and seizures would have no effective official and jury prejudice against the plaintiff-victim who will often be viewed as an "undesirable" simply because he was the target of police investigation. There are also problems with damages (since actual out-of-pocket losses will usually be slight), the financial resources of the defendant (which will often be limited) and, until recently, the governmental unit was protected from liability for the torts of its agents by the doctrines of governmental immunity (abolished in *Ayala v. Philadelphia Board of Public Educ.*, 453 Pa. 584, 305 A.2d 877 (1973) and sovereign immunity (abolished in *Mayle v. Pennsylvania Dep't. of Highways*, 479 Pa. 384, 388 A.2d 709 (1978)). *See* Foote, *Tort Remedies for Police Violations of Individuals Rights*, 39 Minn.L.Rev. 493 (1955) (hereinafter *Foote*); *Roche, supra* at 227–28.

The adoption of effective alternatives is essential to the future of the federal exclusionary rule. It has been suggested that "although the Supreme Court of the United States has thus far merely whittled away at the suppression doctrine, the Court may soon decide to abandon the doctrine entirely." *Geller, supra* at 623. Several of the justices of that Court have indicated recently that they would seriously consider overruling *Mapp v. Ohio*, or at least consider relaxing the strictures of the *Weeks* doctrine, when and if alternative mechanisms existed for protection of Fourth Amendment rights. *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 421, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, C. J., dissenting); *Schneckloth v. Bustamonte*, 412 U.S. 218, 267–68, n.25, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (Powell, J., concurring); *Coolidge v. New Hampshire*, 403 U.S., 491–92, 492–93, 493–510, 510, 91 S.Ct. 2022 (Harlan, J., concurring; Burger, J., dissenting and concurring; Black, J., dissenting and concurring; Blackmun, J., concurring in part in Mr. Justice Black's opinion); *see Roche, supra* at 225–26; *Wilkey*, 493–510, 510 (Harlan, J.,

concurring; Burger, J., dissenting and concurring; Black, J., dissenting and concurring; Blackmun, J., concurring in part in Mr. Justice Black's opinion); *see Roche, supra* at 225–26; *Wilkey, supra* at 217; Miles, *Decline of the Fourth Amendment: Time to Overrule Mapp v. Ohio?*, 27 Cath.L.Rev. 9 (1977). The failure of the states to create other viable means of enforcing Fourth Amendment rights was a crucial factor in the *Mapp* decision which required that the exclusionary doctrine to be applied in state criminal proceedings (since the hope expressed in *Wolf v. Colorado*—that states' reliance upon other methods would prove equally effective—had failed to materialize). *Roche, supra* at 223; *Coe, supra* at 44. Few serious observers of the rule and its effects argue that it should be completely abandoned before viable alternatives exist, since such a course might well be read by police as a declaration of "open season" on criminal suspects. *Geller, supra* at 653.[14] I share this concern. For this reason, the existence of other methods for enforcing the prohibitions against unreasonable searches and seizures are essential.

Numerous possibilities exist. *See generally Geller, supra.* In addition to the common law tort remedies, there exists the federal tort cause of action recognized in *Bivens v. Six Unknown Federal Narcotics Agents,* based upon 42 U.S.C. § 1983. Casenote, *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), *Federal Cause of Action for an Illegal Search and Seizure,* 10 Dug.L.Rev. 710 (1972). The federal cause of action suffers from the same drawbacks as does its common law

14. As Chief Justice Burger, one of the rule's staunchest detractors stated:

"I do not propose, however, that we abandon the suppression doctrine until some meaningful alternative can be developed. . . Obviously the public interest would be poorly served if law enforcement officials were suddenly to gain the impression, however erroneous, that all constitutional restraints on police had somehow been removed—that an open season on 'criminals' had been declared. I am concerned lest some mistaken impression might be fostered by a flat overruling of the suppression doctrine cases." *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 420–421, 91 S.Ct. 1999, 2017, 29 L.Ed.2d 619 (1971) (dissenting opinion).

counterparts, but these causes of action could be significantly enhanced. Abolition of governmental and sovereign immunity in this Commonwealth has already eliminated one of the problems and would allow the plaintiff to reach the deeper pockets of the government unit. Other improvements could include providing a minimum recovery large enough to encourage initiation of civil suits. Attorney's fees could also be made part of the recovery. To combat the problem of jury prejudices, the cause of action could be made non-jury, or tried before a quasi-judicial tribunal created to hear such claims. On an effective tort cause of action, *see Foote, supra; Geller, supra* at 696–98.

Another possibility is creation of a criminal ombudsman who would be an "independent governmental official who receives complaints, conducts investigations and makes recommendations relating to the actions of other governmental agencies. . . ." *Davidow, supra* at 322. The ombudsman could have power to order prosecution of errant officers or to prosecute them himself. *See also* Comment, *Use of § 1983 to Remedy Unconstitutional Police Conduct; Guarding the Guards,* 5 Harv.Civ.Rights Lib.L.Rev. 104 (1970) (advocates court appointment of "monitors" that would serve a similar function as ombudsmen). A related concept is establishment of a civilian review board which would field citizen's complaints and would be empowered to mete out appropriate disciplinary sanctions if the complaints are legitimate. Such sanctions could range from short-term suspensions for minor violations to discharge for flagrant ones. *Roche, supra.*

Another possibility that has received considerable attention from the commentators is the administrative law approach to law enforcement agencies. Davis, *An Approach to Legal Control of the Police,* 52 Tex.L.Rev. 703 (1974); Gilligan & Lederer, *Replacing the Exclusionary Rule with Administrative Rulemaking,* 28 Ala.L.Rev. 533–74 (1977). *Amsterdam, supra* at 408–09, 416–423; *McGowan, supra; Geller, supra.* Police agencies would be mandated to promulgate regulations of general applicability covering the whole

gamut of police operations such as standards for arrest and for search and seizure. Public hearings could be held and comment solicited. The regulations thus adopted would be judicially reviewable in the same manner as regulations of other administrative agencies. The police department of Washington, D. C. has pioneered this approach with some success. *See McGowan, supra* at 684; *Amsterdam, supra* at 425.

Each of these mechanisms and others may be criticized— each has its flaws and each has advantages. They could be tried separately or in combination. The point is that potentially effective alternatives are *possible* and should be tried—perhaps one (or some combination of them) would work where the exclusionary rule has failed. As one author phrased it:

> [T]he exclusionary rule is merely one arbitrary point on a continuum between deterrence of illegal police activity and conviction of guilty persons. As a stopping point, it can be justified solely on the ground that it achieves a better balance between these twin goals than would other points. If another stopping point does the job better, it should replace the current exclusionary rule. Kaplan, *The Limits of the Exclusionary Rule*, 26 Stan.L.Rev. 1027, 1030 (1974).

## G. Legislative Action Needed

The courts, however, are not the appropriate forum to consider all the various proposals or to implement them. The courts are, necessarily, limited by the facts of each case and the advocacy of the parties, and therefore suffer, at times, from "tunnel vision." LeFave, *Improving Police Performance Through the Exclusionary Rule—Part II: Defining the Norms and Training the Police*, 30 Mo.L.Rev. 566, 568 (1965). The legislature, on the other hand, has more fact-finding apparatus at its disposal, can solicit views from all interested parties, can explore all facets of law enforcement procedure and is not confined by the factual matrix of a given case and is, therefore, in a better position to attempt

an accommodation of the competing interests and policies involved. Lumbard, *The Administration of Criminal Justice: Some Problems and their Resolution,* 49 A.B.A.J. 840, 846 (1963).

It is time for our legislature to recognize its responsibility in this field. It has been 65 years since *Weeks* and 18 years since *Mapp.* During this period, no legislative action has been taken to develop more effective methods of protecting the rights guaranteed our citizens by the Fourth Amendment to the United States Constitution and by Article I, Section 8, of the Pennsylvania Constitution. (This legislative inertia can be attributed, at least in part, to *Mapp* itself, *see Weber, supra* at 227, although this does not explain the legislative inaction prior to *Mapp.*) If the legislature adopts a valid mechanism *that works,* it is not unlikely that the United States Supreme Court would overrule *Mapp v. Ohio,* or substantially restrict the reach of the exclusionary rule as applied to Pennsylvania (or any state adopting an *effective* method),[15] or that the majority of this Court would modify the exclusionary doctrine as the remedy for violations of the Pennsylvania constitutional right to privacy.

For the foregoing reasons, I would affirm the judgments of sentence.

MANDERINO, Justice, dissenting.

I dissent. The evidence in this case comes no where near the necessary quantum of evidence required to convict a citizen of a crime. Proof must be beyond a reasonable doubt. Such proof is unequivocally absent in this case.

The defendant, Jill V. DeJohn, was convicted of fatally shooting her husband, Michael DeJohn in the garage of their home on February 11, 1976. Yet, there is no evidence that she was even present in the garage at the time the shooting took place. The prosecution and the majority of this Court conclude that the evidence was sufficient on a theory that the defendant had to be the guilty party because she was

15. Whatever method would be selected, I would recommend that the legislation attempt to provide a mechanism for testing its efficacy.

the only adult in the home at the time the victim was shot. That theory, however, in this case, is riddled with holes. The evidence in this case establishes that the shooting *could have* taken place when only the victim and the defendant were in the home, but it also establishes that the shooting *could have* taken place when the defendant was not at home. The evidence does not even establish that the victim *entered the garage* while the defendant was in the home. It is true that witnesses saw the victim's car enter the driveway at about 6:10 p. m., but no one saw the car enter the garage at that time. It is sheer speculation to conclude that the victim's automobile was driven into the garage immediately after he pulled into the driveway. The two witnesses who saw the car did not know whether the car had been driven into the garage. One of the witnesses, a neighbor, stated that from his vantage point, he lost sight of the car after it entered the driveway and he could not testify whether the car entered the garage. The other witness, a newsboy, did not testify that he saw the car go into the garage. The car may have been driven into the garage at that time, or the driver of the car may have parked the car outside at that time, or the driver of the car may have left the scene after having driven into the driveway, and returned later. Any one of these events could have happened and there is absolutely no evidence from which it can be inferred that one event rather than any of the other two actually happened. Nor can we assume from the evidence or our common experience that the car being driven into the garage immediately after it enters a driveway is more highly probable than not. Our common knowledge would probably indicate otherwise. It may be that more cars are left outside of garages rather than put into garages when one arrives at home. The majority's entire case rests on the conclusion that the victim's car was driven into the garage immediately after his entry into the driveway. No evidence points to this fact. It is sheer speculation. Yet, that speculative fact is essential to the prosecution's theory that if two people are in the same room at the same time when one of them is shot, it may be inferred that the survivor shot the victim.

Even if we speculate for argument's sake that the car entered the garage immediately after it pulled into the driveway, and the victim entered the garage around 6:10 p. m., there is absolutely no evidence that the defendant was in the garage at that time. The defendant and her two young children who were upstairs in the home from 6:10 p. m., until around 7:00 p. m., testified that the defendant did not go down to the garage during that time. The testimony of the defendant and her children can properly be rejected according to the majority. I agree. Rejection of their testimony however does not provide legal proof that defendant *was in the garage*. It was incumbent upon the prosecution in addition to asking that the defendant's testimony be rejected to present *some* evidence that defendant *was in the garage at the time of the shooting*. There was no such evidence. This Court has frequently said that mere presence at the scene of the crime is not enough to convict beyond a reasonable doubt. *Commonwealth v. Finley*, 477 Pa. 382, 383 A.2d 1259 (1978). This Court has also said that:

". . . although the prosecution's evidence establishes appellant's presence at the scene of the crime it does not establish more and without more the conviction cannot stand. Presence alone at the scene of a crime is not sufficient. *Commonwealth v. Leach*, 455 Pa. 448, 317 A.2d 293 (1974); *Commonwealth v. Pierce*, 437 Pa. 266, 263 A.2d 350 (1970); *Commonwealth v. Giovanetti*, 341 Pa. 345, 19 A.2d 119 (1941)."
*Commonwealth v. Finley, supra*, 477 Pa. at 390, 383 A.2d at 1263.

In this case there is not even evidence that the defendant was at the scene of the crime when it occurred.

The time of the shooting was not even established to have been within the forty-five minute period after the victim possibly entered the garage and before the defendant left the home. That is a possibility under the evidence, but it is an equal possibility that the shooting occurred *after* the defendant left the house. The prosecution's medical expert said that in his opinion the shooting took place twelve hours

before the autopsy. This would make the time of the shooting around 9:20 p. m., a period of time when the defendant was not in the home. It is true that the medical expert said that his margin of error could be from two to four hours. His opinion, nonetheless, was that it was around 9:20 p. m. It is also true that this witness stated that a determination of the time of death is quite difficult. He said:

"In this particular case I would estimate the time of death at approximately 12 hours before I examined the body, [9:20 a. m. the next morning] but there is an error in that interpretation. There is possible error in that interpretation of 2 to 4 hours possibly either way. That is the closest I can come to the estimation of time of death."

This witness also said that he "had other information indicating to me that the body was stiff when it was first found at 1:00 [a. m.]. This would indicate to me that death had occurred earlier in the evening." The reference to earlier in the evening was obviously to a time prior to 1:00 a. m. Between 6:10 p. m. and 1:00 a. m. the next morning there is a period of almost 7 hours. Defendant was in the home for only 45 minutes after the victim pulled into the driveway. Given the broad range of the expert's time of death testimony the victim could have been shot when the defendant was in the home, but he also could have been shot during a period several hours after the defendant left home. The expert's reference to earlier in the evening was never tied down to that 45 minute period and, *his opinion* was that death took place around 9:20 p. m.

The majority states that the evidence warrants the rejection of a burglary theory. So it does, but so what? The rejection of that theory does not provide any evidence to convict the defendant. Someone may have wanted others to suspect a burglary, but who? Why the defendant? It could have been another person. There is absolutely no evidence in the record that the defendant pulled out the drawers and messed up the room adjacent to the garage to fake a burglary. If there was any evidence of it the majority's

rejection of the burglary theory would be significant, but there is no evidence that the defendant faked the burglary.

There are other holes in the majority's analysis of this case. The gun from which the fatal shot was fired was never found. There is no evidence that the gun was in the house prior to the victim's arrival in the driveway and into the garage. If the majority must speculate, why speculate that the gun was in the house without any proof from which that can be inferred any more than speculate that the victim had the gun with him when he left for his out-of-town trip and had it with him when he returned?

Today, the majority fashions a new legal standard to support a conviction. The majority says that the "evidence and logical inferences show that appellant had the opportunity, the means and motive to kill her husband," and therefore, the majority concludes that the defendant's guilt was established beyond a reasonable doubt. The majority however cites no statute or case law in support of its proposition. Opportunity, means, and motive have never been sufficient to establish guilt beyond a reasonable doubt—even assuming that those factors were really tied down in this case, which they were not.

To say that defendant had the opportunity is speculative. The defendant was in the home and *might* have been in the garage at the time of the shooting which *might* have taken place when she was in the home and she *might* have had the gun in her possession. There is no evidence to establish any of the *mights* in the preceding sentence. The prosecution's case requires speculation, without evidence, that the victim's car *might* have entered the garage around 6:10 p. m. The prosecution's case requires speculation, without evidence, that the defendant *might* have been in the garage at the same time. The prosecution's case requires speculation, without evidence, that defendant *might* have had access to the gun that day. Convictions, in our system of jurisprudence, cannot rest on such speculation.

The evidence in this case leaves many question marks. It creates suspicions but it does not prove beyond a reasonable

doubt that Jill V. DeJohn shot and killed her husband, Michael DeJohn. The defendant is therefore entitled to be discharged as to the charge of murder.

I have considered the complete record in discussing whether guilt was established beyond a reasonable doubt. That involves a consideration of all of the evidence introduced at trial, whether properly or improperly. I agree with that portion of Mr. Justice Roberts' opinion, however, which takes issue with the approval of the evidence introduced in this case to prove motive. The financial circumstances of the defendant, except for the insurance money, were inadmissible in the prosecution for a crime of violence. As Wigmore has pointed out:

"(2)(a) The *lack of money* by A might be relevant enough to show the probability of A's desiring to *commit* a *crime* in order to obtain money. But the practical result of such a doctrine would be to put a poor person under so much unfair suspicion and at such a relative disadvantage that for reasons of fairness this argument has seldom been countenanced as evidence of the graver crimes, particularly of violence: (footnote omitted.)

Nevertheless in cases of merely peculative crime (such) as larceny or embezzlement), and in civil cases where the issue is whether the defendant *borrowed money* or not, the fact that he was in need of it at the time is decidedly relevant to show a probable desire to obtain it and therefore a probable borrowing or purloining; and there is here not the same objection from the standpoint of possible Unfair Prejudice:" (footnote omitted.) (Emphasis is original.)

II Wigmore on Evidence, § 392 (3d Ed. 1940).

Under the prosecution's theory a person on trial for robbery could have evidence introduced of a prior unrelated robbery because the person needed money on both occasions. Such a theory has never been accepted. If it were, prior robberies

or larcenies or embezzlements or similar pecuniary crimes could always be introduced in a subsequent prosecution for the identical crime. Such a theory has always been rejected. The evidence in this case concerning the defendant's financial transactions should not have been admitted into evidence.

I must also disagree with the majority in its conclusion that the extortion conviction should be affirmed. The search warrant for the defendant's home was improperly issued because the affidavit does not establish probable cause. The bank records must be excluded for the reasons stated by the majority with which I agree. It is immaterial that the typewriter check itself was not introduced into evidence in the extortion trial. The total contents of the check were read into evidence. To distinguish between this and the introduction of the physical check itself is ludicrous. The defendant's attempted extortion conviction was obtained with the use of improperly admitted evidence. The defendant is entitled to a new trial as to this charge.

## PETITION FOR REARGUMENT

MANDERINO, Justice, dissenting.

The petition of appellant, Jill DeJohn, for reargument should be granted to reconsider whether illegally obtained evidence was used in her trial for attempted extortion.

In the majority opinion, this Court held that although appellant had a legitimate expectation of privacy in her bank records and thus had standing to challenge their admissibility, appellant had waived her rights to challenge this same evidence and the fruits thereof as to her attempted evidence conviction. *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979). However, this issue was not waived.

While the bank check used to purchase the typewriter was not introduced at appellant's trial for attempted extortion, appellant did file a motion to suppress this evidence and the other evidence obtained from the information on the check—

the fruits of the illegal subpoena. This motion was denied. Although at trial appellant did not object to the reference to the check used to purchase the typewriter, appellant continues to preserve the issue by objecting to the introduction of the typewriter and the bill of sale for the typewriter—the fruits obtained illegally. In this Court, appellant, as she had done at every stage of the proceeding, argued that the typewriter and bill of sale for the typwriter were "fruits of the poisonous tree"—the check—and were not admissible. Under these circumstances the issue of the use of the inadmissible evidence to obtain the conviction should be reconsidered. Appellant's petition for reargument as to this issue should be granted.